**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEVON BANK as the Guardian of the Estate of ALAYNA HIKE, a minor, and RHONDA JONES, Individually,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA<br>c/o United States Attorney's Office<br>John R. Lausch, Jr., United States Attorney<br>Attn: Civil Process Clerk<br>Dirksen Federal Building<br>219 S. Dearborn Street<br>Chicago, IL 60604<br><br>VHS WEST SUBURBAN MEDICAL CENTER, INC.<br>d/b/a WEST SUBURBAN MEDICAL CENTER<br>Registered Agent:<br>C T Corporation System<br>208 S. LaSalle Street, Suite 814<br>Chicago, IL 60604<br><br>Defendants. | No. _____ |

## RULE 2-622 ATTORNEY AFFIDAVIT

I, RYAN P. TIMONEY, being first duly sworn on oath, depose and state as follows:

1. I am an attorney with the law firm of Beam Legal Team, LLC, duly licensed to practice law in the State of Illinois.

2. I have reviewed the facts of this case and have consulted with an Obstetrician/ Gynecologist who I believe is knowledgeable in the relevant issues involved in this action, is qualified by experience and demonstrated competence in the subject of this case, and who practices, and has practiced within the last six years, in the same areas of healthcare as the Defendants, UNITED STATES OF AMERICA and VHS WEST SUBURBAN MEDICAL CENTER,

INC., d/b/a WEST SUBURBAN MEDICAL CENTER.

3. The consultant has prepared a written report, a copy of which is attached hereto, after reviewing the medical records that are available as of the date of this filing for ALAYNA HIKE and RHONDA JONES and has determined that there is a reasonable and meritorious cause for filing this action against UNITED STATES OF AMERICA and VHS WEST SUBURBAN MEDICAL CENTER, INC., d/b/a WEST SUBURBAN MEDICAL CENTER, and I have concluded, after conducting a Section 2-622 investigation of this case and on the basis of the reviewing health care professional's review and consultation, that there is a reasonable and meritorious cause for filing this action.

## *VERIFICATION*

*I, Ryan P. Timoney, Esq., under penalties as provided by law pursuant to IL Rev. Stat. 735 ILCS 5/1-109 certify that the statements set forth herein are true and correct, to the best of my knowledge information and belief.*

_____
Ryan P. Timoney, Esq.

Date: December 27, 2017

JACK BEAM, Esq. (6285383)
MATTHEW M. PATTERSON, Esq. (6316641)
RYAN TIMONEY, Esq. (6324756)
**BEAM LEGAL TEAM LLC**
954 W. Washington Blvd., Suite 215
Chicago, IL 60607
(312) 733-0930
(312) 733-0921 (fax)
*Attorneys for Plaintiff*

Subscribed and sworn to before me this 27TH day of December, 2017.

_____
NOTARY PUBLIC

TIFFANY N SKEMP
Official Seal
Notary Public – State of Illinois
My Commission Expires Feb 28, 2021

2

**EXHIBIT B**

## AFFIDAVIT OF JEFFREY SOFFER, M.D. AND CERTIFICATE OF MERIT

1. I, Jeffrey Soffer, M.D. am a Board Certified Obstetrician/Gynecologist licensed to practice medicine within the State of New Jersey.

2. My business address is 12 Parrott Mill Rd., Chatham, New Jersey 07928.

3. I am over the age of 18 and I am competent to make this affidavit.

4. I am knowledgeable in the relevant issues involved in this particular action. I practice and have practiced for the last thirty-six (36) years, including the last six (6) years, within the same area of Obstetrics and healthcare that is at issue in this particular action. I am qualified by experience and have demonstrated competence in the subject matter at issue in this case. A copy of my current curriculum vitae evidencing my education, training, and experiencing is attached hereto and incorporated into this affidavit as Exhibit A.

5. Prior to making this affidavit, I was provided with the following medical records:

    a. PCC Community Wellness Center Prenatal Records

    b. West Suburban Medical Center Labor & Delivery Records

    c. West Suburban Medical Center EFHM

    d. West Suburban Medical Center Neonatal Records

    e. Lurie's Children's Hospital Neonatal Records

6. I am familiar with the standard of care for a reasonably well-qualified Obstetrician-Gynecologist practicing in the Chicagoland areas in the year 2016. I am likewise familiar with the standard of care for a reasonably well-qualified Family Medicine physician, to the extent the Family Medicine physician is practicing obstetrics and delivering babies as occurred in this action, who are practicing in the Chicagoland area in the year 2016.

7. After my review of the above described records, I consulted with counsel for ALAYNA HIKE, a minor. Based upon my experience, my education, my training, my knowledge and my review

of the pertinent medical records identified within this affidavit and given the clinical presentation of RHONDA JONES, the mother of ALAYNA HIKE, as documented in the medical records and her subsequent management, it is my professional opinion that one or more of the Defendants, including but not limited the WEST SUBURBAN MEDICAL CENTER (hereinafter "Defendant HOSPITAL") and its physicians ERIKA CASTRO, M.D. (hereinafter "Defendant CASTRO"), REBECCA DEHOEK, M.D. (hereinafter "Defendant DEHOEK"), SVEVA BROWN, M.D. (hereinafter "Defendant BROWN"), MADISON MORGAN, M.D. (hereinafter "Defendant MORGAN") and the other physicians and nurses who provided care and treatment on December 1-2, 2016 to RHONDA JONES and/or ALAYNA HIKE deviated from the applicable standard of care.

8. It is my understanding from counsel for the minor, ALAYNA HIKE, that Defendants CASTRO, DEHOEK, BROWN, and MORGAN are deemed federal employees of the United States government necessitating this affidavit and report.

9. The following serves as a brief explanation of the deviations of the applicable standard of care. I reserve the right to supplement, amend, edit and/or modify my opinions upon receipt of additional information.

10. That at or about 1:29 p.m. on December 1, 2016, and for some time prior and subsequent thereto, RHONDA JONES and her Baby ALAYNA, while *in utero* and thereafter, as a minor, did receive medical care, treatment and attention from various employees and/or agents, whether actual or apparent, of the Defendant HOSPITAL, including but not limited to Defendant CASTRO, Defendant DEHOEK, Defendant BROWN, Defendant MADISON, LIZBETH RODRIGUEZ, M.D., nurses and other medical personnel.

11. That prior to December 1, 2016 RHONDA JONES was seen for prenatal care on at least three (3) occasions where assessments for her pregnancy and fetal well-being were done. In the medical

records which are available, RHONDA JONES' prenatal care for her pregnancy with ALAYNA was unremarkable.

12. That on or about December 1, 2016, at 11:59 a.m. RHONDA JONES was seen in Triage at the Defendant HOSPITAL with complaints of abdominal pain initially to rule out labor.

13. At the time of her presentation, RHONDA JONES was 40 years old, gravida 11, para 9, at 38 5/7 weeks, presenting with possible loss of fluid. She had visual changes, was seeing spots, positive frontal headache, tingling sensation of bilateral hands. Initial non-stress test revealed fetal heart rate 130s, moderate variability, positive accelerations, no decelerations, irregular contractions, negative ferning and pooling. The presentation was consistent with a healthy and intact unborn baby.

14. RHONDA JONES and her unborn Baby ALAYNA were admitted by Defendant CASTRO and/or Defendant DEHOEK and were in the care and treatment of the Defendant HOSPITAL and its agents and/or employees including physicians such as Defendant CASTRO, Defendant DEHOEK, Defendant BROWN, and Defendant MADISON, fellows, residents, nurses, and other healthcare professionals. The reason for admission was an attempt at induction of labor secondary to preeclampsia with severe features.

15. Based upon her presentation, including but not limited to the following risk factors: advanced maternal age, extreme grand parity, severe preeclampsia with severe features, possible gestational diabetes, limited prenatal care, and obesity, RHONDA JONES was a high-risk patient who needed to be assessed and/or managed by specialists including maternal fetal medicine specialists and/or obstetrician-gynecologists (ob/gyn) during her admission. Instead, RHONDA JONES' labor was managed exclusively by family medicine physicians, including the named DEFENDANTS, who do not have the specialized training, education and experience to appropriately care for a patient such as RHONDA JONES. The failure to obtain appropriate consultation with maternal fetal medicine

3

specialists and/or ob/gyn was a deviation from the appropriate standard of care for these physicians which caused or contributed to ALAYNA's outcome.

16. Following admission, an order was entered that RHONDA JONES be continuously monitored via an electronic fetal heart monitor ("EFHM"). On December 1, 2016, an order was entered that RHONDA JONES was to be placed on continuous EFHM. She was connected to the EFHM until from approximately 12:01 p.m. until 12:32 a.m. December 2, 2016 according the available records.

17. However, during those hours, despite the order for continuous monitoring, there are hours of tracing that are illegible or otherwise unreadable as to the status of the fetal heart rate and/or the contractions. By way of example but not limitation, at 17:07 the nurse comment includes that the fetal heart rate is not tracing; at or about 18:08: difficulty getting FHR; at or about 18:56 irritability of the contractions was noted, which is a known indicator of potential irritation from bleeding which can presage abruption; at or about 19:58 R.N. at bedside, attempting to get heart tones; at or about 20:13 "notified MCH of difficulty obtaining heart tones, will assess fetal position"; at or about 21:01 minimal variability; at or about 21:15 poor pick-up with vaginal exam 2cm / 50% / -3 station; at 21:30 minimal variability; poor pick-up or detection of fetal heart rate including but not limited to 21:45 through 22:15; minimal variability at 22:15; poor pick-up or detection of fetal heart rate including but not limited to 22:40 through 00:33; nurse "attempting to get fetal heart tones at this time" at 00:13; at 00:19 "attempting to obtain fetal heart tones per external monitor..."; at 00:26 "pulse ox placed on mom to verify maternal heart rate".

18. The failure to adequately and reasonably monitor the unborn baby's heart rate was a deviation from reasonable practice and a direct violation of an express physician order. If the physicians and/or nurses were unable to continuously and reliably trace the baby's heart rate *in utero*, using an external fetal heart monitor, which was apparently the case, the standard of care required inserting an internal fetal scalp electrode hours sooner than it was placed. The failure to continuously and reliably

4

monitor ALAYNA's heart rate, *in utero*, and the failure to utilize the internal fetal scalp electrode were deviations from the standard of care which caused or contributed to ALAYNA's outcome.

19. During the admission on December 1-2, 2016, prior to the delivery of the minor-Plaintiff, there is an absence of reasonable nursing and/or medical charting, documentation, recording such that the patients were not being monitored as ordered and required and/or the charting, documentation, recording was not done as required and/or the charting, documentation, and/or recording was created but has since been lost, is missing, or was destroyed. The failure to monitor and/or the failure to document the actions and/or the failure to maintain the medical record are all deviations from the standard of care applicable to RHONDA JONES' and ALAYNA's care and treatment.

20. Shortly after admission, at 1:45 p.m. on December 1, 2016, a vaginal exam revealed RHONDA JONES was 1cm / 10% effaced / -4 station with a non-tender abdomen and reflexes +2. The plan of care was to induce labor due to her diagnosis of severe preeclampsia with severe features. She was provided labetalol and Magnesium sulfate. Given RHONA JONES' diagnosis and medications, including labetalol and Magnesium sulfate, the standard of care required a heightened degree of diligence and monitoring over her induction. Moreover, the standard of care required the intrapartum healthcare team to be prepared for immediate delivery by cesarean section if any complication arose. The medical records evidence that RHONDA JONES was grossly under-monitored including the unreadable tracing identified above and the lack of nursing and/or physician progress notes described above.

21. At or about 15:30, and for a majority of time thereafter, ALAYNA's heart rate, in utero, as recorded on EFHM is uninterpretable and provides no data regarding her fetal status. If the care providers were unable to place an internal monitor and obtain a continuous and reliable tracing of ALAYNA's heart rate, the standard of care required the healthcare providers, including the DEFEDANTS outlined above, to move toward delivery by cesarean section. Given RHONDA JONES'

5

extreme and severe risk factors, including preeclampsia with severe features being treated with magnesium sulfate and labetalol, gestational diabetes, grand multiparity, advanced maternal age and body mass, it was unreasonably dangerous to persist with an induction of labor without being able to monitor the baby's heart rate. The entire management of induction from this point forward was a deviation from reasonable practice which caused or contributed to ALAYNA's injuries.

22. At or about 00:13 a.m. on December 2, 2016, upon rupture of membranes, RHONDA JONES was having severe abdominal pain. Given RHONDA JONES' preeclampsia, this abdominal pain was mostly likely an abruption and/or uterine rupture which is a medical emergency.

23. At that time, the vaginal exam was reported at 7-8cm dilation. At this point the primary care nurse was unable to get the fetal heart rate on the monitor. In response, a fetal scalp electrode was finally placed showing heart rate 60s. A fetal heart rate in the 60s is bradycardia consistent with a placental abruption and/or uterine rupture. The standard of care required an immediate crash C-section be performed. The delay in performing the necessary C-section was a deviation from the standard of care which also caused or contributed to ALAYNA's outcome.

24. Nearly 20 minutes later, at or about 00:32, the annotation on the fetal monitor tracing indicates consent for surgery was completed. Consent was done by Defendant BROWN and Defendant MADISON, verified by Briana Johnson, RN. The physicians again confirmed that ALAYNA's heart rate was bradycardic in the 60s.

25. Thereafter, a crash C-section was performed with delivery of ALAYNA at or about 00:49 on December 2, 2016. The C-section was performed by Defendant MADISON, with Defendant BROWN and Defendant DEHOEK participating and/or assisting in surgery. This was approximately 36 minutes after it was first determined that ALAYNA's heart rate was in the 60s. This delay in performing a necessary and emergent delivery was a deviation from reasonable practice which caused or contributed to ALAYNA's outcome.

26. According to the medical records, "baby Girl Jones [the minor plaintiff] delivered 12-2-16 at 00:49 by emergency c-section secondary to fetal bradycardia/decelerations. Maternal history 40y/o G11P90010 scant prenatal care, presented to triage with possible spontaneous rupture of membranes, headache/vision changes, elevated blood pressure, accuchek 66, admitted for induction of labor sevpndary to severe pre-eclampsia. Started on mag sulfate. Given stadol for pain. Fetal heart rate persistently 60s, so stat c-section performed. Rupture of membranes officially at 00:13. Baby delivered with no spontaneous movement, cyanotic, no respiratory effort. Started positive pressure ventilation immediately and heart rate improved to greater than 100. Still no respiratory effort although color improved, no movement. Intubated at 10mins of life with 3.5, taped at 9cm..."

27. Umbilical venous gas was pH 6.63, arterial pH 6.52; at 40 minutes of life pH 7.14, base excess-20. At or about at 40 minutes of life, the baby was transferred.

28. Placental abruption was determined at or about 00:45 on December 2, 2016.

29. The neonatal delivery attendance record includes, "Baby delivered with no respiratory effort, cyanotic, no movement, heart rate about 50, given PPV for 1 minute, heart rate to greater than 100, color improved by 5 minutes, still no movement or respiratory effort. Intubated at 5 minutes with 3.5 ETT given bag ventilation with sats 99% color pink HR 126, transfer to LCH."

30. RHONDA JONES needed, and was provided, packed red blood cells and a transfusion for intraoperative hemorrhage. She was given a diagnosis of premature separation of placenta with DIC.

31. The Progress Record from Dr. Rodriguez, a resident-physician, at or about December 2, 2016 at 1 a.m. indicates, "Baby Girl Jones born to a 40y/o G11P90010 at 38+6 based on 14 week ultrasound. Mom had history of gestational diabetes mellitus during her last two pregnancies. Scant prenatal care with only 3 visits. Elevated 1 hour GTT and never completed 3hr GTT. Mom presented to triage with possible SROM, frontal headache tingling sensation of bilateral hands, and vision changes. No p.o. intake for 1 day. SROM was ruled out. Mom found to have an accucheck of 66, BP initially at

130s but progressively increase to severe range SBP 160-170s. Mom admitted for induction of labor for pre-eclampsia of severe features. Started on mag at 6pm; last level 3.2. Continue to contracting every 7-10 minutes and officially SROM at 00:13, clear fluid, cervical check 5cm / 70% / -2station. Stadol given for pain control. Attempt at placing fetal scalp monitor showed a persistent heart rate 60s, prior to rupture of membranes HR 120s-130s. Emergent C-section for possible placenta abruption. Apgars 1,5,8. After stimulation HR continued at 50-60bpm, O2 at 100% was provided resulting in improvement of HR to greater than 100..."

32. Baby ALAYNA at birth weighed 3305g and was transported to Lurie Children's Hospital and was treated with hypothermia whole-body cooling for severe encephalopathy, diagnosis Hypoxic Ischemic Encephalopathy, given phenobarbital, had both clinical seizures and as confirmed on EEG, and abnormal MRI with marked diffusion consistent with severe, acute intrapartum HIE.

33. Currently, Baby ALAYNA's condition includes HIE, motoric and mental disabilities, seizures, is on anti-seizure medication, and will now and in the future, on information and belief, require extensive and full-time attendant care, treatment and therapies. As a result of her medical condition, Baby ALAYNA will not be gainfully employed. She and her caregivers, including her parents, will incur substantial expenses for the care and treatment of her child and into the foreseeable future.

34. That on or about December 1, 2016 and thereafter and at all times relevant herein, the Defendant HOSPITAL, by and through its physicians, both attending and resident staff, as well as nursing staff in labor and delivery, including but not limited to Defendant CASTRO, Defendant DEHOEK, Defendant BROWN, Defendant MADISON, Lizabeth Rodriguez, M.D. Irina Lozovatskaya R.N., Karen Gillett, R.N., Briana Johnson, R.N., Jennifer Joseph, R.N., Lillie Smith-Beacham, R.N., Joy Nfarooqui Staffid, R.N. and Kimberley Bruno, R.N., did undertake the care of the Plaintiff, ALAYNA HIKE, and her mother, RHONDA JONES, during the course of the prenatal and labor and delivery.

35. It then and there became the duty of the Defendant HOSPITAL, by and through its aforementioned physicians and nursing employees including Defendant CASTRO, Defendant DEHOEK, Defendant BROWN, and Defendant MADISON, to render health care services consistent with the medical requirements of the patient ALAYNA HIKE, and her mother, RHONDA JONES, and to possess and apply that degree of care and skill commonly exercised by other health professional facilities in the same or similar circumstances.

36. After assuming the care and treatment of ALAYNA HIKE, a minor, and her mother, RHONDA JONES, the Defendant HOSPITAL by and through the aforementioned physician and nursing staff employees and/or agents, including but not limited to Defendant CASTRO, Defendant DEHOEK, Defendant BROWN, Defendant MADISON, Lizabeth Rodriguez, M.D. Irina Lozovatskaya R.N., Karen Gillett, R.N., Briana Johnson, R.N., Jennifer Joseph, R.N., Lillie Smith-Beacham, R.N., Joy Nfarooqui Staffid, R.N. and Kimberley Bruno, R.N., individually, were then and there guilty of one or more of the following negligent acts and/or omissions:

    a. Failure to perform a timely cesarean section which would have prevented injury to Baby ALAYNA;
    b. Failure to appreciate and identify the patient's high risk status and timely and appropriately treat the patient's high risk factors;
    c. Failure to obtain an appropriate consultation of an appropriate medical specialist competent and capable of managing the patient's high risk conditions including consultation with a maternal fetal medicine specialist and/ or an obstetrician/gynecologist;
    d. Failure to assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and contraction monitor and changes thereof which were indicative of deterioration of the fetal status including but not limited to consistent with hypoxia and/or ischemia which necessitated interventions to correct and should said interventions fail to improve the condition, failure to deliver earlier;
    e. Failure to follow physicians orders including but not limited to continuously electronically monitor the fetal heart rate during labor;
    f. Failure to monitor and record the fetal heart rate throughout labor which was, for the majority of the admission before delivery, uninterpretable and unreadable;
    g. Failure to keep proper medical and/or nursing documentation including but not limited to progress notes, physicians notes, nursing notes, flowsheet notes, vital signs, labor assessments, fetal heart rate assessments, uterine assessments, patient assessments, etc.;
    h. Failure to assess the intrapartum fetal status including but not limited to the fetal heart monitor tracing and contraction monitor and changes thereof which were indicative of

9

irritability of the uterus consistent with bleeding and /or abruption which necessitated interventions to correct and should said interventions fail to improve the condition, failure to deliver earlier;

i. Failure on the part of the agents, servants, and/or employees of the hospital including nurses to inform the physicians of the fetal status and to advocate for earlier delivery;
j. Failure to provide adequate informed consent regarding the nature of the risks to the unborn baby of brain injury to a fetus deprived of oxygen during labor, and failure to react appropriately thereto including but not limited to earlier delivery;
k. Failure to adequately inform and/or perform a Cesarean section delivery in order to avoid intrapartum hypoxic ischemic neurologic injury and/or traumatic injury;
l. Failure to perform a timely cesarean section which would have prevented injury to Baby ALAYNA;
m. Failure to properly manage Plaintiff RHONDA JONES' labor including but not limited to failure to perform earlier delivery;
n. Failure to perform intrapartum fetal evaluations and/or interpret abnormal signs and/or symptoms and intervene earlier;
o. Failure to utilize the chain of command when notification of concerning signs and symptoms were not immediately responded to; in other words, the health care provider(s) should have called for and obtained physician(s) to treat the patients, prepare for timely surgery, and expeditiously deliver the baby rather than to allow the baby to continue to deteriorate at a time the health care provider(s) knew or should have known that to fail to intervene with earlier delivery would substantially increase the risk of harm to the baby;
p. Failure to retain a full and complete legible copy of the medical records;
q. Failure to maintain and provide proper and adequate documentation including but not limited to nursing notes, triage notes, plan of care regarding notification of physicians, nurses and staff for assessment and treatment;
r. Failure to hire and/or credential competent and qualified providers, including physicians and nurses, with the adequate training, education, and experience to manage intrapartum and obstetrical patients and/or failure to fire and/or remove/ de-credential incompetent and/or unqualified providers, including physicians and nurses, such that the incompetent and/or unqualified providers could not cause patients harm;
s. Failure to promulgate, implement, and maintain reasonable and appropriate policies and procedures;
t. Comply with JCAHO [Joint Commission on the Accreditation of Healthcare Organizations a/k/a The Joint Commission];
u. Any other breaches of the standard of care revealed during discovery in this matter.

37. As a direct and proximate result of one or more of the aforesaid acts of negligence, Baby ALAYNA, did sustain serious injuries; that the aforementioned did directly or proximately cause or contribute to Baby ALAYNA's injuries, including severe hypoxic ischemic encephalopathy and severe brain injuries which resulted in mental retardation and probably Cerebral Palsy, that Baby ALAYNA has suffered great pain, suffering, disability and will in the future continue to endure such pain, psychological, neurological and emotional injuries, and will incur large medical expenses; that the

Plaintiffs did sustain other pecuniary Loss and other expenses and damages and will in the future incur other pecuniary loss and expense.

38. As a result of the failure to consult with the appropriate specialists, failure to appropriately monitor the patient, failure to develop and implement a reasonable plan of care, and ultimately the failure to deliver ALAYNA earlier by C-section, as described in more detail above, ALAYNA was caused to suffer from prolonged and severe intrapartum hypoxia, or a lack of oxygen to the body's vital organs including the brain, which resulted in severe and permanent brain damage known as Hypoxic Ischemic Encephalopathy.

39. In my clinical opinion, the DEFENDANTS breached the standard of care required of them while caring for laboring mothers and their babies in utero and earlier delivery was required. It is my medical opinion, to a reasonable degree of medical certainty, that earlier delivery would have prevented ALAYNA's hypoxic-ischemic brain damage.

40. For the foregoing reasons, it is my professional opinion that there is a reasonable and meritorious basis for filing an action against Defendants CASTRO, DEHOEK, BROWN, MADISON, and the Defendant HOSPITAL.

41. This affidavit and report does not address all of my opinions in the matter. The above opinions are my preliminary opinions subject to amendment or supplementation upon the acquisition of additional information such as additional medical records and/or deposition testimony.

42. I certify that I do not have any financial interest in the outcome of this litigation and that my compensation for professional services in not associated with its outcome.

FURTHER THE AFFIANT SAYETH NAUGHT

STATE OF NEW JERSEY
COUNTY OF UNION, TO-WIT:

Before me, the undersigned authority, personally appears Jeffrey Soffer, M.D., who being first duly sworn according to law, deposes and says that the averments contained in the foregoing "*Affidavit of Jeffrey Soffer, M.D. & Certificate of Merit*", are true and correct to the best of his information, knowledge and belief.

Jeffrey Soffer, M.D.

Sworn to and subscribed before Me, this the 25th day of April, 2017

My Commission Expires: 5-10-17

MADELINE WALSH
Notary Public
State of New Jersey
My Commission Expires May 10, 2017
I.D.# 2420641

NOTARY PUBLIC

12

CURRICULUM VITAE

January 20, 2017

JEFFREY L. SOFFER, M.D.

| | |
|---|---|
| Home Address: | 5 Friar Lane<br>Watchung, NJ 07069<br>908-755-0840 |
| Office Address: | 12 Parrott Mill Road<br>Chatham, New Jersey 07928<br>908-232-4449 |
| Date of Birth: | December 20, 1947 |
| Place of Birth: | Brooklyn, NY |
| Marital Status: | Married 1970, Wife: Sheryl<br>    Children: Robert Jason, age 41<br>              Michael Eric, age 38<br>              David Lee, age 38 |
| Education: | B.S. Brooklyn College, 1965-1969<br>M.D. Howard University College of Medicine, 1971-1975 |
| Postgraduate Training: | 1975-1976, Intern in Obstetrics/Gynecology and Medicine<br>Hospital of the University of Pennsylvania;<br>Philadelphia, PA<br><br>1976-1979, Resident in Obstetrics/Gynecology<br>Hospital of the University of Pennsylvania<br>Philadelphia, PA |
| Licensure: | New Jersey, # 33527 |

Membership in Honorary Societies:

1974  Alpha Omega Alpha Medical Honor Society

1983  Board Certified in Obstetrics/Gynecology

Membership in Professional Societies:

Fellow of the American College of Obstetricians and Gynecologists

Diplomate of the American Board of Obstetrics/Gynecology

American Medical Society

Union County Medical Society

Phi Delta Epsilon Medical Fraternity

New Jersey Obstetrical Society

Hospital Affiliations:

Attending Physician, Department of Obstetrics and Gynecology,
Overlook Hospital; Summit, NJ

Assistant Chief, Department of Obstetrics and Gynecology, Overlook Hospital
1990-1992

Chief, Department of Obstetrics and Gynecology, Overlook Hospital
1992-1994