**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DEVON BANK as the Guardian of the Estate of ALAYNA HIKE, a minor, and RHONDA JONES, Individually, )))))  Plaintiffs, ) )  v. ) )  UNITED STATES OF AMERICA, and VHS WEST SUBURBAN MEDICAL CENTER, INC. d/b/a WEST SUBURBAN MEDICAL CENTER )))))  Defendants. ) | Case No.: 1:17-cv-09286 |

DEVON BANK as the Guardian of the Estate of  )
ALAYNA HIKE, a minor, and                    )
RHONDA JONES, Individually,                  )
                                             )
            Plaintiffs,                      )      Case No.: 1:17-cv-09286
                                             )
v.                                           )
                                             )
UNITED STATES OF AMERICA, and VHS WEST       )
SUBURBAN MEDICAL CENTER, INC. d/b/a          )
WEST SUBURBAN MEDICAL CENTER                 )
                                             )
            Defendants.                      )

**PLAINTIFFS' MOTION FOR SETTLEMENT/PRETRIAL CONFERENCE**

NOW COME, the Plaintiffs, DEVON BANK, as Guardian of the Estate of ALAYNA HIKE, a Minor and RHONDA JONES, Individually, by and through their attorneys, Beam Legal Team, LLC, and submit the following *Plaintiffs' Motion for Settlement/Pretrial Conference.* In support thereof, the Plaintiffs would respectfully show unto the court the following:

1. Alayna Hike is now almost three years old and suffers from severe hypoxic-ischemic encephalopathy, mental and motoric delays, a seizure disorder, and spastic quadriplegic cerebral palsy. Alayna is so devastated from her brain damage that even the defense expert life care planners agree that she will require 24/7/365 supervision and attendant care for the rest of her life. See Excerpt of the Deposition of Lawrence Vogel, M.D., Exhibit A at 57:9-14; see also Excerpt of the Deposition of Richard Katz, M.D., Exhibit B at 88:10-13.

2. The cause of Alayna's devastating brain damage is a lack of oxygen and blood to her brain in the final hour before her delivery. It is undisputed in this case that had Alayna been

1

delivered earlier by Cesarean section, she would be a neurologically intact and healthy little girl today.

3. The Defendants in this case, West Suburban Medical Center ("Defendant Hospital") and the United States of America (by virtue of the Federal Tort Claims Act) grossly mismanaged Alayna's mother's labor admission, violating Illinois law and the standard of care in the process causing the child's injury. The Defendants' witnesses and even experts have admitted it.

4. Briefly, Alayna's mother, Rhonda Jones, came to the Defendant Hospital on December 1, 2016 complaining of contractions, headache, and dizziness. After a triage assessment, Ms. Jones was admitted to the Defendant Hospital with a diagnosis of severe preeclampsia – hypertensive disease in pregnancy – for an induction of labor. See History & Physical, Exhibit C. Ms. Jones and baby Alayna were admitted by three "deemed" USA Family Practice doctors (not OB/GYNs): Morgan Madison, M.D., Rebecca DeHoek, M.D., and Sveva Brown, M.D.

5. The Defendant Hospital, under Illinois law, is known as a Level II Perinatal Facility. See Discovery Response, Exhibit D. Pursuant to the State of Illinois Regionalized Perinatal Health Care Code, **Level II facilities must consult and ultimately transfer any maternal patient with a diagnosis of "severe preeclampsia."** Ill. Admin. Code tit. 77, § 640.42 (outlining when Level II Facility must consult with maternal fetal medicine specialist regarding specific patients); see also Ill. Admin. Code tit. 77, § 640 App. H, Exh. B (appendix requiring "transfer" of patients with "Severe pre-eclampsia."). Despite the mandate of Illinois law to consult on and ultimately transfer Ms. Jones due to her diagnosis of severe preeclampsia, no doctor or nurse ever even called an OB/GYN or maternal fetal medicine specialist to discuss Ms. Jones. Instead, she was allowed to labor in this Level II facility in violation of Illinois law.

6. Plaintiffs' maternal-fetal medicine expert, Ben Hamar, M.D., testified:

And in those rules [Administrative Code Re Perinatal Care], it sets out guidelines about which conditions are appropriate to be able to be care for at the institution and which require a consultations with a Maternal-Fetal Medicine subspecialist. And there is a specific list of conditions, which is included in an appendix…**In that appendix it specifically lists as a condition – a maternal condition for transfer severe preeclampsia or eclampsia.**

**So based on the hospital policy, [the Defendant Hospital's] agreement with Northwestern, and the applicable rules and regulations that govern that and are referred within that, this patient should have been transferred**.

See Excerpt of the Deposition of Benjamin Hamar, M.D., Exhibit E at 63:18-64:11. This conclusion is undisputed in this case as both the Hospital's retained liability experts, Maternal Fetal Medicine doctor Phillip Samuels, M.D. and former obstetrical nurse Katherine McDannel, R.N. agree that the Illinois Administrative Code required Ms. Jones be transferred. See Excerpt of the Deposition of Phillip Samuels, M.D., Exhibit F at 93:9-98:14; see also Excerpt of the Deposition of Katherine McDannel, R.N., Exhibit G at 26:4-32:9.

7. After reviewing the relevant Administrative Code, the ***DEFENSE EXPERT*** Maternal Fetal Medicine doctor testified:

Q: If we go over to Exhibit 4, that's the Appendix H written protocol for consultation, transfer, transport. Do you have that?
A: I've got it.
****
Q: And of Subsection 2, Maternal Conditions that Require Transfer, did Ms. Jones fit any of those, A through J?
A: Well, she fits J.
Q: That's because she had severe preeclampsia, true?
A: Correct.
****
Q: **So under the administrative code that we just walked through, Ms. Jones should have been transferred due to her severe preeclampsia?**
****
A: **According to the document, yes, she should've been transferred**.

3

Exhibit F at 96:24-98:14 (emphasis added) (objections omitted). Similarly, the **DEFENSE EXPERT** nurse testified:

> Q: So this is the Illinois code standard for patients who should be consulted on or transferred out of Level II facilities, true?
> A: That's its title, yes.
> Q: And if you look at Exhibit 3, Subsection 2, there are a list of maternal conditions that require transfer under the Illinois standard, correct?
> A: That's the title.
> Q: And **subparagraph J of subparagraph 2 includes specifically a diagnosis of severe preeclampsia as a diagnosis that would require transfer to a higher level facility, correct?**
> A: **That's what this document says**.
> \*\*\*\*
> Q: And we certainly will, and that's why I qualified my question by **this document published by the Illinois Department of Public Health, would you agree with the plain reading of it that Ms. Jones' diagnosis of severe preeclampsia mandated her transfer to a higher level facility, correct?**
> \*\*\*\*
> A: **It's listed here, yes.**

Exhibit G at 30:15-32:2 (emphasis added) (objections omitted). But, Ms. Jones was never transferred.

8. Making matters worse, after admitting Ms. Jones to its own facility in violation of Illinois law, the attendings, residents, and nurses failed to continuously monitor Ms. Jones' and her baby during the high-risk admission as was indisputably required under the standard of care until the baby was found to have a terminal bradycardia causing the severe brain damage. This time, it was the deemed USA Family Practice attendings who admitted to violating the standard of care. One of the **DEFENDANT ATTENDINGS**, Rebecca DeHoek, M.D., testified:

> Q: You told me earlier that the [Hospital Fetal Monitoring] policy required that there be a steady, uninterrupted signal for continuous fetal monitoring, correct?
> A: Correct.
> Q: You **agreed with me that the standard of care required continuous fetal monitoring for high-risk patients like Ms. Jones, correct?**
> A: **Correct**.

4

> Q: Do **we know agree that there was not a stead, uninterrupted signal for the vast majority of her labor?**
> A: **Correct**.
> Q: The [Hospital] policy was violated, correct?
> A: Yes.
> Q: And *the standard of care was violated, too, right?*
>                                    ****
> A: *Yes*.

See Excerpt of the Deposition of Rebecca DeHoek, M.D., Exhibit H at 134:24-135:20 (emphasis added) (objections omitted). Yet another one of the deemed USA Family Practice doctor attendings, Sveva Brown, M.D., admitted the providers were negligent caring for Ms. Jones and her baby, testifying:

> Q: And we've looked at that [Hospital Fetal Monitoring] policy at the beginning of your deposition, you agree that the policy stated that there should be a steady, uninterrupted, continuous signal for patients who are on continuous fetal monitoring; correct?
> A: Correct.
> Q: That wasn't done here, was it?
> A: It was not.
> Q: Was that policy violated, in that there was not a steady uninterrupted signal maintained for Ms. Jones and her baby?
> A: It was.
> Q: And **you also agreed with me at the beginning of the deposition that, for any high-risk patient like Ms. Jones, continuous fetal monitoring is required under the standard of care; correct?**
> A: **I agree. Correct.**
> Q: You likewise **agree[]** *that the standard of care was violated since there was not a continuous, steady, uninterrupted fetal heart rate signal for this mom and baby*?
> A: *I agree*.
>                                    ****
> Q: If Alayna had been delivered prior to her heart rate becoming bradycardic, do you have an opinion whether or not she would have avoided the acidosis, perinatal depression, and subsequent hypoxic ischemic brain injury she was diagnosed with?
>                                    ****
> A: I would have to say that, **if the baby was not bradycardic, that there would be no – no injury to the baby**.

See Excerpt of the Deposition of Sveva Brown, M.D., Exhibit I at 115:6-116:18 (emphasis added) (objections omitted). But, this mom and baby were not properly monitored, nor timely delivered and innocent baby Alayna is left suffering the tragic consequences every single day for the rest of her life.

9. At this Court's initial direction, the parties engaged in settlement discussions in early 2019. By agreement, the parties conducted a mediation with the former Illinois Appellate Court Justice Michael Gallagher in June.[1] Since then, Justice Gallagher has been diligently working with all parties, on a nearly daily basis, to reach an agreed settlement. However, as of the date of this filing, the parties have not come to terms on an agreement and Plaintiffs remain in active but separate negotiations with the USA and the Defendant Hospital.

10. At a status conference before Your Honor on August 14, Plaintiffs advised the Court that the parties were in settlement negotiations but were at a near stalemate regarding some of the non-monetary terms of the settlement insisted upon by the Defendant USA. Further, Plaintiffs proposed that settlement may be facilitated if Your Honor were to become involved in some way in the discussion. The Court advised it would reach out to Justice Gallagher to assess the status of the negotiation, if the Defendants did not object. Apparently, while never contemporaneously communicated to the Plaintiffs, the Defendant USA advised Your Honor that it objected to the Court's participation in settlement discussions. Thus, to date, Your Honor has not taken on any role in these ongoing discussions.

11. There is an amount the USA has offered, but at this juncture it is not a concrete number.[2] The Defendant USA insists any settlement is conditioned upon placing 50% of the gross

---

[1] Since the USA could not pay for a private mediator, Plaintiffs agreed to pay 2/3 of all of Justice Gallagher's fees related to mediation, which is over and above good faith effort to attempt resolution for this tragic case.
[2] In compliance with the rules of evidence and ethical considerations, Plaintiffs will not discuss any of the specific terms of the settlement discussions in this pleading and/or in open court.

6

amount paid by the government into a "Reversionary Trust." A Reversionary Trust is a legal trust created to be used for the benefit of the injured party – here Alayna – for the life of the child. Then, when the child dies the amount remaining in the trust reverts back to the government and is not distributed with the child's estate. Given that the lawsuit and concept of compensatory damages are to benefit Alayna and make her "whole," the concept of a reversionary trust is not outright rejected.[3] However, in this instance, the government is insisting upon so many limitations and restrictions as to how the trust money can be utilized for Alayna's benefit that it renders the entire settlement ephemeral, if not illusory.

12. It is critical to note that there is absolutely no statute, case law, authority, or even (to Plaintiffs knowledge) infamous Department of Justice Internal Policy which requires any plaintiff be subject to a reversionary trust, either with a judgment or settlement.

13. That said, Federal Courts have weighed in on the concept of a reversionary trust and have universally found no requirement it be utilized for any party. The Third Circuit Court of Appeals held "in administering the [FTCA], a district court should not make other than a lump-sum money judgment unless and until Congress shall authorize a different type of award." Frankel v. Heym, 466 F.2d 1226 (3d Cir. 1972) at 1228-1229. The Tenth Circuit Court of Appeals further held that district courts do have the inherent authority to order parties to place a money judgment into a reversionary trust if such an arrangement is in the best interest of the injured party, such as the extreme instance where there is concern the natural heirs of the party may kill the individual to obtain an inheritance. Hull by Hull v. U.S., 971 F.2d 1499 (10th Cir. 1992) at 1504. The most recent Appellate case discussing this issue is out of the Fifth Circuit Court of Appeals where the Court declared, like here, "the government fails to point to any authority, in the FTCA or

---

[3] In fact, Plaintiffs' counsel has settled other cases with the USA using a reversionary trust.

elsewhere, that requires the district court to fashion a remedy that approximates [a reversionary trust] treatment of future medical care damages." <u>Vanhoy v. U.S.</u>, 514 F.3d 447 (5th Cir. 2008) at 453-455. The Fifth Circuit Court held

> Like the First and Third Circuits before us, we refuse to deviate from the conventional lump-sum award by insisting that, absent particular circumstances (none of which are present here), the district court create a reversionary trust – at least not until or unless Congress expressly authorizes such an arrangement.

<u>Id</u> at 455. Congress has never authorized any such arrangement under the FTCA.

14. Plaintiffs understand that the cases cited, *supra*, deal with judgments, not settlements. Plaintiffs further recognize and agree that a reversionary trust can be a mutually agreed condition of a settlement in a civil case. Plaintiffs further advise that they are willing to accept a reversionary trust as part of a settlement with the USA in this case. However, where an innocent child was so devastatingly injured by such obvious and admitted negligence, it is unconscionable for Plaintiffs to accept terms to a reversionary trust, which is not legally required, where Alayna will have little to no access to the money within the trust to take care of her most basic needs: housing, transportation, or reasonable attendant care.

15. Therefore, Plaintiffs renew their request for Your Honor to conduct a settlement conference between Plaintiffs and the Defendant United States limited in scope to discussing the terms of the proposed reversionary trust.[4] Plaintiffs strongly believe that Your Honor's input may facilitate movement in this otherwise intractable negotiation and possibly even resolve this case as to the United States.

16. Plaintiffs are now aware that the Defendant United States objects to Your Honor's participation because it somehow believes it is improper for the Court, as the ultimate fact-finder

---

[4] Plaintiffs are not requesting the Court become involved in the ongoing negotiations between the Hospital and the Plaintiffs.

in this FTCA case, to become involved in settlement discussions. However, at a bench trial, the Court will be tasked (as all court's conducting bench trials are) to weigh the relevant and admissible evidence when reaching its conclusions while excluding from consideration irrelevant or inadmissible information it may discover throughout the course of a case or trial. This should be no different. But, should the Court feel restrained by the United States' continued objection to its participation, Plaintiffs request a referral to a Magistrate Judge for a pre-trial settlement conference for the same limited purpose of discussing the terms of the proposed reversionary trust with the Plaintiffs and Defendant United States.

WHEREFORE, Plaintiffs respectfully request that this Court grant *Plaintiffs' Motion for Settlement/Pretrial Conference.*

Dated: September 6, 2019

        Devon Bank, as Guardian of the Estate of
        ALAYNA HIKE, and RHONDA Jones,
        individually, Plaintiff.

        By counsel,

        /s/ Matthew Patterson
        Jack Beam, Esq. (6285383)
        Matthew M. Patterson, Esq. (6316641)
        Ryan Timoney, Esq. (6324756)
        **BEAM LEGAL TEAM LLC**
        954 W. Washington Blvd, Suite 215
        Chicago, IL 60607
        Phone: 312-733-0930
        Fax: 312-733-0921
        jbeam@beamlegalteam.com
        mpatterson@beamlegalteam.com
        rtimoney@beamlegalteam.com
        *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I, Matthew M. Patterson, of Beam Legal Team, LLC, counsel for Plaintiffs, hereby certify that on September 6, 2019, I electronically filed *Plaintiffs' Motion For Settlement/Pretrial Conference* with the Clerk of the Court using the CM/ECF system which will send notification to the following CM/ECF participants. I further certify that on this date, a copy of same was sent to all counsel of record via electronic mail as indicated below.

Jimmy Arce, Esq./Tom Walsh, Esq.
219 South Dearborn St.
Chicago, IL 60604
JArce@usa.doj.gov; TWalsh@usa.doj.gov
*Attorneys for Defendant USA*

Carmel M. Cosgrave, Esq./Dana Raymond, Esq.
Smith Amundsen LLC
150 N. Michigan Ave., Ste. 3300
Chicago, IL 60601
ccosgrave@salawus.com; draymond@salawus.com
*Attorneys for Defendant West Suburban Medical Center*

                                                  /s/ Matthew M. Patterson
                                                  MATTHEW M. PATTERSON, Esq. (6316641)